Due to our earlier technical difficulties that prevented us from having a full panel hearing your case, we're going to essentially start over. And Mr. Cohn, you will have one additional time. You guys will just be on our time as we go forward, if you would like to take it for additional argument. But let's make sure that we have all of us fully on time. All right, Mr. Briggs. Thank you, Your Honor. If I may, I would like to pick up where Your Honor left. I think I do still have the question in mind. To the extent we're disagreeing, I don't think it is about the Montana State Court decision, but perhaps about what counts as derivative under this court's 2018 decision. I think that this court's decision is best read to contemplate that there are some actions that could be characterized under state law as being direct, but for purposes of 524G, are nonetheless derivative. And the court's citation of Gass and Dodds really confirms that. And what's significant, I think, about Gass is that it's actually not a respondeat superior case or an instance of vicarious liability, as Your Honor was referencing earlier. The provisions that were cited under the second restatement, 410 and 414, are instances of direct liability. And 414, for example, is the heading of it is negligence and exercising control retained by the employer. So the nature of the tort there is that it is an action against the employer because it has retained control and it's an action about negligence against that employer. Nonetheless, the court put it in the box of being derivative because it's an instance in which, and certainly was the fact pattern in Gass itself, where the harm that was created was by the contractor, was by the conduct of a third party. So we think what we have here fits squarely within that context. It's true, it's not like respondeat superior or it's not like vicarious liability because they're bringing a tort against us based in part on our conduct rather than an instance in which we're blameless. But we don't think that that's what this court recognizes being the test for derivative liability. We certainly put some bounds around it, but we did it on both sides. You can have direct and derivative liability at the same time, and that's what those cases point up. But on the other hand, we also talked about following the model of Quigley, where notwithstanding a parent and sub relationship, we took it as a claim that wasn't based on the relationship, but only on the actual use of the name and logo. And here, we have to decide which of those molds we're in. Going back to the extent that Judge Fuentes may not have been able to hear the question earlier, I want to just return to the parameters of what we're talking about. And that's the concern that we're talking here about an independent duty. And that the Montana Supreme Court in Maryland Casualty had explicitly distinguished the liability from harm directly caused by a first party's tortious conduct from the liability for harm that's directly caused by the tortious conduct of a third party that's We are looking at 324A of the restatement with regard to your claim as well. Why isn't it also in that latter category? I do want to respond to the reference to Quigley and understanding what the parameters this court set. The Second Circuit's decision on Quigley actually doesn't decide the question of whether the claim for an apparent manufacturer theory is derivative or not. It specifically reserved that question and addressed the separate issue of whether it's arised by reason of the relationship. And I'm happy to talk about that issue, but I don't think it actually is instructive on derivative liability except to the extent that the court in footnote 7 was citing Quigley for the point, we look to state law as being relevant to inform what counts as derivative liability. The court absolutely did set benchmarks on both sides in terms of what could count as derivative and what couldn't. The one that it gave was the falling ceiling tile example. And I think that example is instructive because it's an instance in which the defendant's alleged liability, alleged duty is totally disconnected from the debtor. And it's noteworthy that the nature of that theory, the nature of that duty would be basically a premises liability theory that you were an owner of a premises. So you're responsible for things that happen on it. The Montana court in footnote 20 of the decision specifically addressed that line of case law as an example that is not like the 324A action because it's an instance in which a defendant is being held responsible for its own actions, harm that it's itself potentially created. And it distinguished that case as being quite different from 324A, which it noted was a more limited theory of liability where you're being held potentially responsible for the party, which is here is grace. If what we're talking about here is as alleged, your client undertaking to perform a duty beyond that, just simply incidental to the provision of insurance, but undertaking to perform a duty that otherwise would have been owed by grace, then why isn't it a separate freestanding independent basis of liability? I don't think it is separate. Again, it is that we are being, we are an additional tort fees or that is the allegation that was not disputed in the first appeal with the plaintiff's primary argument that look, this is a tort claim. You're being, we're trying to hold you liable for your own conduct, not for the conduct of someone else. Therefore, we win this by its nature, cannot be derivative. And the court rejected that. And I think it's telling that the plaintiffs on remand and they're being here have not identified anything that could satisfy any tort claim against an insurer that could conceivably satisfy their understanding of the test when you have needing derivative liability and by reason up to the elements of the claim. It's essentially a null set. And I don't think that that's a sensible result in terms of how to read the 2018 decision. Don't we need to look now at 324A and going through it and the three predicates determine whether any or all of them involved derivative liability. We, we agree that you're supposed to look to the nature of the state claim. The 2018 decision clearly provides that those three prongs are additional factors. That's not, they're not in them in and of themselves independently sufficient to establish liability under 324A. You have to first have to demonstrate that there is an undertaking and that there was, there was a reason to think that there was a serious risk that needs to be addressed. Our, our point and our submission is that under the circumstances of this case, the, the reason for our duty, the reason for that arising is completely dependent on what Grace did and its tortious activities. If it had not been engaged in dangerous operations there, there would not have been a risk for us that we had a potential obligation to undertake to address. So we think that that. Sorry, sorry. You're on a streak. I'm sorry for interrupting. But what you said, prompted a, a thought of my, maybe it was Judge Krause's question coupled with your response. But at one level, what the prior panel of this court did was it remanded. And the reason that it remanded was based on the, the understanding, the answer to this question depended on a choice of law issue, which is really pushed to the side. We all, we all get that. There's no dispute there. But then it depended on what the state law was. And so I guess in my head, I'm thinking to myself under your theory, what we, the prior panel wouldn't have remanded if there wasn't a way under a conception of state law for plaintiffs to win and a way under state law for you to win. They would have just said, oh, state law is immaterial. Any way you decide state law, the channeling injunction channels or any way you decided it doesn't change. And so I guess what, what I'm wondering is now we get a ruling from the Montana Supreme Court that says, oh yes, in fact, we've decided state law in a way that doesn't channel through the injunction. What, just so that we don't render the prior panel decision a null set, when we in a Supreme Court have reached that would have meant that CNA was outside the scope of what the bankruptcy code permits to be in a channeling injunction. Well, as your honor knows from the record, there was a dispute during the remand about what the nature of the state law cause of action would be. We were arguing that it should be decided under 324A, that that was the exclusive means of holding an insurer liable in this context. Whereas the plaintiff's primary submission, which they adopted for the first time after the court's remand was, was that, no, actually there's this freestanding duty under Montana law that if you were in the best position to identify a hazard, you have a risk, you have a duty to warn against a perceivable risk or as a provider of professional services, you have your own duty to engage not negligently. And you won't be surprised to learn that the parties were each arguing that they should win under both conceptions. But I don't think it's a coincidence that we were arguing that 324A and the plaintiffs for the other side, if it were, if the theory were divorced from any undertaking to grace, did not depend on grace creating a risk, but was just, look, we don't care about the relationship between you and grace. You, but you happened to be in a position and it was foreseeable that there was this risk, or you were providing services and you have an obligation, much like a landlord, you have an obligation as a professional provider of professional services. So you have that duty. It's a different, it's a different inquiry and we would have had a tougher argument. But, but, but I think my thought there is at one level, I totally get how that would affect the statutory relationship requirement, because if, if, if grace wasn't the insurer, but was just some occupational safety entity that came in and said, oh, we, we noticed there's a lot of dust and other, other products in the air. Well, that occupational safety entity might still incur a 324 liability, got no shot, at least as I, at least as I read the statutory relationship requirement of falling under that. So they couldn't be part of the channeling injunction, but, but they could be part of the derivative liability part or non-part. And so I guess my question is, this remand though, wasn't under the statutory relationship part. So what sort of outcome could the Montana Supreme Court have reached that would have, because we wouldn't have remanded it if that wasn't possible. Could they have reached that would have said that would have foreclosed grace from claiming derivative, you know, that the derivative liability problem was met? To be clear, the court did remand on both issues as to the liability and statutory relationship. And of course we need to show both in order to prevail. So, you know, to the extent the court had doubt on statutory relationship, that could in and of itself describe the reason for remanding. But it's reason, but, but I mean, like, like great point, but it remanded on the other one too. So that means the first one had to make a difference. And so, so I guess what I'm saying is what is the way that the Montana Supreme Court could have resolved that first question that would have made it? I know, I know you knew that's what I was saying. Sorry for interrupting. No, no, I understand. As I said, I do think there is a conceivable difference between 324A and the other actions. We also do think it would be possible to imagine claims against an insurer that would probably qualify as non-derivative. For example, a claim based on the insurer's bad faith in the processing of, of the claim. And such an action was at issue against MCC. MCC prevailed upon that in, in the lower court, but there were, it was, you know, I think we probably, again, we would have argued the same either way. It probably won't surprise you to learn, but I do think our arguments would be harder if they had not adopted the 324A framework. If they had acknowledged a potential bad faith claim, which would have been based on our status as an insurer, but not connected to race creating, creating a harm or a risk. And conversely, I don't think there is anything that could status that could have come through under the plaintiff's understanding. If you think that it is an element of, it has to be an element of the claim that both you are being held liable for the debtor and you, that you're providing insurance is also an element. I don't, I, we are not aware of any, Mr. Cohn has not previously identified anything that would qualify within the scope of the channeling injunction, aside from the direct actions for insurance proceeds. And I think it's clear in their brief that in, in how they address the remand that they refer to the court's reasoning as making interesting observations, but things that are not relevant to the claims they are bringing. And the district court again had, I'm sorry, the bankruptcy court to, in reaching the result that did, it flatly rejected several aspects of the court's reasoning, including a key part of its statutory interpretation, which was to say that these actions are not going to be limited by their nature to direct actions for insurance proceeds. To set exactly the opposite of that, I think, because otherwise it is hard to understand the need for remand under their theory of the case. Because, I mean, it does seem like, I mean, it does seem like if 324 does not qualify as derivative, then populating what would qualify as derivative beyond a direct action for insurance proceeds is a tough set to populate. That is, that is certainly our position. And when you also take in the second prong, that it has to be something that is going to arise by reason of insurance, we think it's a null set under, other than an indemnification claim seeking insurance proceeds. And that- One of our, I mean, our themes throughout grace one was that what we're looking for in terms of derivative liability is a liability that is predicated on the liability of the debtor. Right. And so it's not just that there's a product or conduct it's on the, or wrongdoing, it's on the liability. And that's where the concepts of legal relevance also can come into play. But doesn't that mean when we look back to 324, that there are ways, for example, under sub one in terms of enhancing the risk, increasing the risk of harm. Well, that necessarily builds on liability with the risk to begin with. So there might be an argument that it's derivative, whereas undertaking to perform your very own duty taking that on when it was otherwise would have been owed by the third party, would not seem to be so dependent on liability of that third party. In other words, even looking at 324, it seems and accepting that there need to be ways to acknowledge derivative liability and in certain aspects, whereas a separate duty and others, that seems to be also built into 324 itself. If we're going to look through each of these three prongs and think about it in those terms. I don't think I disagree with how your honor's reading 324A, except I will reiterate that the three prongs only come into play once you establish the threshold conditions, which is that not only is there an undertaking, but there is a risk. And the relevant facts here are that Grace created that. It can't be. I mean, we rejected in Grace one, the idea that any risk, right, you know, any risk is going to bring the case within the auspices of derivative liability. We, and that takes you very close to the, you know, to the tile, right? I mean, there's certain risks involved. Although here, we're not really talking about a defective product, right? We're talking about a, you know, an operation that had to be maintained within certain, you know, parameters to remain compliant and safe, or at least far safer for those who are working in that environment. And so the monitoring, the engineering that, you know, the industrial hygiene seem like they take on independent importance. And whoever is taking on that duty. I agree that, you know, the duty is significant, but what the court held in the first case, at least as I understand it, in terms of what it rejected, was a theory that a pure factual connection that just the debtor's asbestos being the instrument of the injury is sufficient to the court said, no, that's, that's not enough. But what we have here is different in 324a, because the creation of the risk is not just an incidental fact that has nothing to do with the theory of duty, as would be the case when you're holding a landlord liable, just for the under apprentices liability theory, but you're under 324a, the creation of the risk and the understanding, the need to abate it is part of the claim. And I do want to respond to your point about the court's focus on liability and graces liability. It does say that one instance, but there are several other instances in the opinion of the court refers more broadly to graces liability or wrongdoing graces liability for conduct, we think it can't be limited solely to liability, among other reasons, that would create a problem where you have somebody that clearly is conduct is responsible for action, but it's immune for some reason, which was the gas and is arguably analogous to what you have in bankruptcy, where grace itself can't be held liable as a result of the channeling injunction. So it has to extend beyond liability. In that respect, we think the statutory language in referring to conduct provides a pretty good hint that it needs to extend more broadly than that. And the court was interpreting that language and in response in addressing the broader structural features of the statute and the incentives that are created, the court recognized the importance of providing closure to insurers and who are looking to settle. And if you have an instance in which some insurers can be held indirectly responsible for conduct of another party, even if you have, you're saying, well, you, you have, you had a duty to ameliorate that, that harm that they created, or you undertook a duty to warn people about it, that the court, we think, recognized and understanding what the scope of the incentive was and the need to get closure to insurers, that that kind of pleading around really creates a problem. And it's not, and if it was limited to liability. Well, wouldn't, wouldn't, wouldn't that uncertainty lead insurers to ask for a partial refund of any amount that they contribute to a trust to say, hey, look, we know that we're good for direct, you know, we know that once we pay into a trust, we're insulated by the channeling injunction for direct actions for insurance proceeds. We don't know where we stand with respect to some of these other 324 and other type claims, freestanding state law claims, whatever they are. So what we'll do is we'll contribute X dollars. We know that with the X dollars, we're buying ourselves a nice direct action insulation, but we want a refund if we ever get sued for anything else, because we're taking a risk and we're kind of allocating the risk. And if someone pioneers a new claim under 324 or a freestanding state law claim, well, we want out of the trust for them. And so it seems that there's a way built in that the market can kind of hedge where you can say, look, it's still worth it to us to pay in to a trust to a certain amount, because we get an injunction for a direct, a direct action. And we'll take, we'll on a risk assessment, we'll buy a little more for these other claims, but maybe we'll get something back. So to your point, it seems that exactly what CNA did is consistent with uncertainty that would lead to a strange incentive system, but it can be accounted for by sophisticated players. I think that's quite right in the absence of precedent, which was the way CNA was proceeding at this time. As your honor noted, we did in fact include an indemnification provision because we thought these types of claims ought to be covered by the channeling injunction, but we were aware that they were out there and there was not clear precedent determining whether they were going to be something that had to be channeled to the trust or could be brought against the insurer. But once you have a decision from this court saying that no, is in fact, these types of claims cannot be channeled. I'm not sure that that kind of arrangement will work to the extent it does, it's going to be exorbitantly expensive to the trust because the insurer knows that it's going to be on the hook for these potential claims. And it's not a coincidence that the case, arguing that adopting the rule of the bankruptcy court and that the Montana plaintiffs are going to be advocating is going to be really detrimental to the way these trusts are formed and funded. If insurers don't have an incentive to settle, or if they do settle, but with significant potential paybacks from the trust, that's coming out of the pocket of other claimants. And the way this system is supposed to be structured is you want to channel as many claims as you can that are really encompassed within rising from the debtor's wrongdoing, its asbestos conduct and the asbestos injuries. And you want them all going to the same trust so that you get horizontal equity among claimants rather than particular claimants being able to go outside of that system and seek higher recovery and trust that is going to come away from other people that are in there. No, go ahead. Well, you do where you're dealing with the liability of the debtor and third parties where their liability is direct and indirect liability, as we're addressing today. But if you have a third party that has taken on their duties that are freestanding duties, why should those be channeled with the more limited returns that might be provided in a trust? If there is proven to be, in fact, an undertaking where it is not a it's not a controlled, you know, under the control of someone else, but in fact, has taken over duties that were otherwise owed. Why shouldn't there be direct liability there for that independent duty? How does that actually, I mean, the 524 D trust is for the liability of the debtor. If it doesn't relate to the liability of the debtor, because there's liability for of a different duty, why, as a policy matter, why would it make sense to even go into the trust? To response to that, Judge Krause, first, I think respectfully that that starts to look very much like an insurance proceeds limitation, that you're the argument is that the only thing that is belongs to the estate that is that we are trying to channel are the claims for to seek recovery under the insurance policies and the insurance proceeds. And that's exactly what the court rejected in 2018. In terms of the broader incentives and why you would want to do this, as we've explained, as the Casualty Trade Association explained in its amicus brief, these are routine insurance services to provide inspections and loss-related recommendations. And as a matter of fact, Montana law post states these policies, but now requires insurers to engage in risk management practices and make recommendations. So these are just things that is risk assessments that are just incidental to insurance. That doesn't seem like it would qualify under 324A. No, that's quite right. And that's why we should win in state court if it goes there, but we don't think that that is the relevant question for whether the channeling injunction should apply. And your honor asked about the incentives created. It routinely, because these are things that insurers do. It's just part of providing insurance that they do this. It means that in every instance, even when you try to settle your liabilities for the insurance proceeds under the policies, you're going to face a potential tort claim. Now, maybe sometimes those tort claims will succeed. Maybe they won't. You can have arguments about the scope of it, but that's going to be expensive to do in state court proceeding under the vagaries of state law. And to have it be routinely that you're going to have that kind of a second bite at the apple, even though the insurer has tried to settle, we think creates an enormous disincentive to insurers entering these settlements in the first place, certainly without significant backend indemnification as Judge Phipps indicated. And that operates to the detriment of the trust as a whole and to the whole class of claimants. It depends on the allegations of the complaint. I mean, why wouldn't you just assess what is alleged? If what's alleged in the complaint is something far beyond the incidental risk assessment that is maybe part and parcel of the provision of insurance, then it could go forward. If that's all that's alleged, then it would fit within the channeling injunction. Well, I haven't understood this other side to concede even that. I think their view is that maybe you would lose under Montana law, but it still would not fit within the channeling injunction. And just fundamentally, I don't think this inquiry about whether you have a viable duty under state law, because it's only the kind of things that insurance routinely do, or maybe this insurer did a little bit more than another one. As in the MCC case, the claim that they actually found a duty on was based on engaging in medical monitoring practices, which is not something that has developed at all in the complaint against us, to the extent that's relevant. But we don't think that the inquiry is supposed to be is there a viable state law claim, or is there not a viable state law claim? 524G is supposed to protect us against both to the extent we are being held potentially liable for risks that the debtor created that are directly relevant to our duty under state law, and that follow directly from our provision of insurance to that debtor. Let me just ask you a hypothetical. This is one off, and this may not be helpful. So if it's not helpful, don't spend too much time on it. But what if CNA, in sending its air quality inspectors and its ambient environmental inspectors out, it sent them out a lot, like a ton. And then they developed asbestosis as a result of exposure to the Libby complaint. And that now they want to sue, and they want to it might not be a 524 claim. It might be responding. It might be an employer liability claim. It might be all these other things. Would that get channeled? I think probably not. I mean, among other reasons, pure workers' compensation claims, and this was addressed in the first appeal, are not subject to the channeling injunction. And the reason that these claims, nonetheless, were held to fall within the scope of the policy is subject to the question about the scope of 524G. It's because the policies at issue were both workers' compensation and employers' liability. And the relevant rights that we had under the policy to engage in inspections and make loss control recommendations were applicable to both. So pure workers' compensation claims, whether it's by people working at the mine and mill in Libby, or CNA employees, do not get sent a channeling injunction. You can bring those standalone workers' compensation claims. What this addresses is trying to hold us liable in tort for damages that were caused by specifically the asbestos that were released by Grayson, its operations. Do you want to address dods and gaffs, which you touched on earlier, but I want to make sure we're all able to hear your arguments? Yeah, I'm pleased to. I think the reason those cases are significant is because they were identified by the court as examples of derivative liability, where the defendant is alleged to have engaged in some of its own wrongdoing. And beyond that, it's also significant that the claims at issue there, and this is very clear in gaffs with the Restatement 410 and 414 provisions, those were not instances of vicarious liability or respondeat superior. So whatever this court meant by derivative liability had to mean more than just pure instances of something held vicariously liable or a respondeat superior theory. Those were instances, and I read when we rejoined here, the provision of 414, the 414 is for negligence of exercising control retained by the employer against the employer. So that is an instance in which you're holding the employer, it's a direct tort against the holding it liable for its alleged wrongdoing, but the court characterized it as derivative nonetheless, because under the nature of that tort often, and certainly under the facts of gaffs, the risk was being created by the independent contractor, by another party. And so the fact that the court characterized those as derivative, we think is important. And they appeared at the end of a string site. I can understand the court having concern about how much weight to give them, but they were provided as examples of what it means to be something that is an instance of derivative liability, not withstanding the defendant's wrongdoing. And more than that, I think to go to Judge Pitt's questions earlier, they helped the content to what on earth the remand meant, that it has to be something that is different from just pure vicarious liability, just pure, you know, the debtor, it's an element of the tort claim that debtor is in fact liable. Because if you did that, then there would have been no reason to remand and Montana plaintiffs should have won the first time, but the court rejected that. And I think the fact that the court was pointing to gas and dodge as instances of what it means to be derivatively liable for purposes of this statute anyway, is instructive. And it shows that it is more robust than the Montana plaintiffs suggest. And so what you're saying there is basically in those cases, so typically there's one way of thinking of derivative liability as the rights that the wrongdoer would have against, I guess, CNN or the defendant in this case. And in those cases, they expanded, we've hinted that they're expanding derivative liability beyond the set of just those rights that the wrongdoer would have against the defendant and included different theories that were freestanding from rights from the wrongdoer against the defendant. I guess you're asking for an extrapolation of those, or maybe not, maybe just saying the fact that those are already mentioned suggests, or we should read that that contemplates a broader set of derivative liability than just a narrower set. Am I understanding that argument right? Or am I over piecing it? No, I think that's basically right with the caveat that those decisions themselves don't engage with the question of what is derivative or not derivative, but they're dealing with instances of liability that are characterized under the restatement as being direct. They're clearly examples in which the defendant itself is being held liable in part for its own wrongdoing. And yet the court identified those as examples of derivative liability referring in the parenthetical with respect to gas, specifically to 410 and 414. So I just don't know what that citation in the parenthetical was doing except as an example of something that could be, that is characterized as derivative liability, notwithstanding not being vicarious, notwithstanding the defendant having its own duty that it could have potentially acted wrongfully. Isn't the difference that there's a degree of control and that's built into the liability under 410 and 414, right? The employer has retained some control. Right, and the claim is being brought against the employer. You know, the allegation here is that CNA has some control and the claim is being brought against us. My point is that that is not preclusive of treating the claim as derivative when the action is, when the risk is being created by another party. I'm not saying it's like a The allegation is not that CNA has control over grace. Right? No, the allegation is not that CNA has control over grace. The allegation is, but I think it's similar in the sense that the allegation in the 414 sense is that the normal default rule for independent contractor liability is that the employer doesn't have any liability with respect to things the independent contractor does. That's, and then there are various exceptions to that that would be versions of precarious liability, but 410 and 414 are examples of exception where the employer itself has done something gratuitously. You know, it didn't have to retain any control and nonetheless it did and is being potentially held liable on account of that. I think the analogy to the context is the claim is, you know, CNA is not generally liable for the wrongdoing of a third party, but under a 324a theory, the argument is that it for compensation or gratuitously undertook this duty and so it took on its own duty, but for the same reason that 414 should be treated as derivative under there where the risk and the nature of the duties is tied up in another party, so too in the 324a example. I guess I'm not understanding where the control element comes into play here. I mean, I think the point I'm trying to make, I don't know if it's about control specifically, is that it is an instance in which the, you know, taking on your own sort of independent duty, the court treated as not being preclusive of it qualifying as a derivative claim, that we are like the employer in that respect, that normally you would have no liability for things that another party does, but because the employer had control over the ultimate work product, it could be held liable for its own negligence, and yet the court said that that was derivative. Then we looked at 324a to determine, you know, for a third party that wouldn't otherwise have liability, you know, does it meet these criteria, and then, you know, considering these, you know, with the backdrop of 524. So, you know, looking to 324a, I mean, I take it your argument is that just the introductory paragraph, the fact of an undertaking, because it's necessary, the protection of a third person presumes that someone else is causing harm, and so it's necessarily derivative, and that's the end of your analysis. The fact that it is part of the duty here, that we undertook an undertaking to our insured, and the insured created the risk, and that is why we are potentially being held liable. Yes, that's the argument. We also think when you go through the prongs, as your Honor mentioned, at least with respect to the first one, several of them do clearly implicate grace, whether you were making the situation worse than grace did initially, whether grace has delegated responsibility to you, whether grace has relied, but I do think our primary submission is that to even get to those prongs, the predicate is there has been a risk created, and you have undertook to address it, and that risk was created by the third party. That has sweeped pretty broadly. I think it's not going to, I don't think it'll sweep broadly to encompass all types of claims that are against the insurer. As I noted to Judge Fitz, there are several that would not. Conversely, again, the other side has not identified anything that could qualify as a tort, so I think that as between something, but not everything, and nothing, our view has to be the better reading of the 2018 decision. If the Court has no other questions, I can reserve to rebuttal. Okay. All right, Mr. Cohn, we'll hear from you. Thank you, Your Honor. Good afternoon, and may it please the Court. My name is Daniel Cohn, and I represent the Appalese, who are 27 individuals sick or dying of asbestos disease, whom we refer to as the Montana Plaintiffs, and whose claims against CNA we refer to as the Montana Claims. In 2018, this Court remanded to the Bankruptcy Court to determine the state law requirements for the Montana Claims, and based on those requirements, whether the Montana Claims can be enjoined under Section 524G4 of the Bankruptcy Code. When remanded, the Bankruptcy Court agreed with the Montana Plaintiffs that their claims cannot be enjoined, but even more importantly, as this Court has noted, last year, the Montana Supreme Court issued a definitive decision on the Montana law applicable to the Montana Claims, and that Supreme Court decision effectively confirmed that Judge Chan was correct in her ruling that CNA's liability is wholly separate from and does not depend on claims do not meet the derivative requirement that this Court articulated in its decision. So first, I'll address the derivative requirement and then turn to the statutory relationship requirement, if I may, recalling that, as Mr. Burgess acknowledged, both requirements must be met for the Montana Claims to be enjoined. So as it pertains to the derivative requirement, the Montana Supreme Court said two very important things. First, Restatement Section 324A, as interpreted by the Montana Supreme Court, supplies the standard for CNA's liability under Montana law, and second, that under that standard, CNA's liability under Montana law is wholly separate from any conduct or liability of grace, and that's really the entire answer under this Court's 2018 decision. Well, let me just, let me just, let me just interrupt, because at one level, I get that both causes of action arise from a different duty, but when we say should they be wholly separate, aren't they both going to require proof of, like, common causation, like exposure leading to asbestosis? If you don't prove that against grace, you aren't going to be able to, you know, if you can't prove that, you have to prove that against both. Causation has to be proven in both instances, I assume, for damages purposes, and so if there's commonality in causation, right, exposure leads to asbestosis, how are they wholly separate? Because, Your Honor, there is, there is a huge amount of, of overlap in what you would need to prove. I mean, these plaintiffs are sick, they're sick from asbestos, they're sick from Grace's asbestos, and inherent in this Court's observation, not just observation, but ruling in 2018, that showing that Grace's asbestos caused the injury is not enough to make it derivative, this Court expected and acknowledged that there would be substantial overlap of proof that you just, that you just questioned me about. That just goes with the ruling, the asbestos quarrel, Your Honor. You, no matter who the defendant is, you need to prove that there was an injury from asbestos and that asbestos disease resulted. But, but, I mean, the example of the ceiling tile falling, I get, is wholly separate, because that, that, that would be entirely on, you know, if it was CNA that operated the premises and the, and the, and the ceiling tile fell, I don't think you can hold Grace responsible for that. That's completely separate. Zero overlap, wholly separate. But here, there's a, I mean, I just think there's substantial overlap in the sense that there's common causation, common facts that have to be that CNA is liable in a way that Grace would never be liable and vice versa. Then, then maybe you get somewhere. But, but if we get to elements and facts and balancing elements and facts, I just, I just, I don't think that the difference in duty carries the day, because there's other parts of proof necessary for liability that these claims have in common. What do you think? Well, what I think, Your Honor, is that the 2018 decision supplies the answer to that. This Court has already ruled that it's a matter of what are the legal requirements that are necessary to hold CNA liable. And if those requirements do not include that Grace is liable, then it's, it's not a derivative claim. Is there a scenario where Grace would not be liable and, and CNA could be liable under 324A? Absolutely, Your Honor. If, if, as we noted in our brief and as, as you noted in your question, this was just an industrial operation that, like all industrial operations, generates hazards that you need to remediate. Through industrial hygiene. And if Grace properly delegated the duty to, to administer a safety program to CNA, and CNA failed in that duty, then it might well be that, that CNA is liable and that Grace is not. There is nothing about Section 328, 324A that refers to Grace's liability. Could also have been, Your Honor, it could also have been that there was an earthquake and a bunch of asbestos dust got stirred up and that's what needed to be remediated. And that's the undertaking that, that CNA made. Could be that John's Mansion, you know, was responsible for the asbestos. It, it, it, none of that matters for purposes of Section 324A. 324A focuses entirely on the undertaking, on the undertaking of CNA in relation to a hazard, however it came about. Could you say that again in relation to? In relation to a hazard. Oh, a hazard. Something that creates a danger to a, to a third party, in this case, our, our clients. Well, what about the 924G language of being directly or indirectly liable for the conduct of the debtor? Yes, Your Honor. You know, Mr. Burgess actually gave the answer to that, but let me amplify it. So as a matter of statutory construction, right, the words conduct and liability have to cover two separate topics because if conduct were simply a broader term encompassing liability, or for that matter, if liability were a broader term encompassing conduct, then there would have been no reason for Congress to use the two separate terms. Mr. Burgess raised the example of, let's suppose the debtor is immune for some reason. Let's say it's the Town of Libby, which actually put, this is true, Your Honor, this is not a hypothetical, Town of Libby actually put the asbestos trailings from racist operations on the track because it but, but let's say the Town of Libby is exempt under Montana law, as most municipalities would be from, from liability, yet its conduct in putting those trailings on the asbestos track, on the, the running track at the high school, that would be liability generating conduct. It would be conduct that, but for an exemption would be, would be, would, would, would generate liability. So that's, we think the meaning, that's why Congress needed to use the word conduct as well as the term liability. But, but it doesn't just stop at conduct. It says conduct claims against or demands on. So it seems to suggest that, that it would be that liability, I guess what you're saying is if liability has to be distinct from conduct, it would also have to be distinct from claims against and demands on, and that's a lot harder to say that I'm liable, but it's distinct from the claims against me, or it's distinct from the demands against me. So if it's distinct from conduct, it would also, if you give this just normal principles of statutory construction, have to be distinct from the latter two, and that's a much harder sell, isn't it? No, Your Honor. First of all, demands is just a technical term that the, that 524 uses to mean future claims, claims, claims of asbestos injury that haven't yet been asserted. So we can really put demands to one side because it has its own technical meaning under the statute, but it's a fair question to ask, okay, then, you know, what's, why, why does liability have to be there as a separate, as a separate term? And again, we think that the reason for that is because liability picks up vicarious liability situations in which there was not, in which conduct was not necessarily relevant. For example, I mean, as Judge Krause earlier observed, this is not a products case, but there, but certainly a lot of the claims against Grace, in fact, hundreds of thousands of claims against Grace were products claims. And in a products claim, if you put an inherently dangerous product out in the marketplace, it doesn't, your conduct doesn't matter. It doesn't matter whether you were careful or not careful or whatever. You're just vicariously liable for the, for the consequences of that. So that's the reason we think why, why both liability and conduct were necessary for the statute. But the important point for this purpose is that conduct means liability generating conduct. It doesn't just mean, it doesn't just mean, you know, conduct in any kind of abstract, abstract sense that Grace, you know, happened to be there, that it happened to be Grace's facility and so on and so forth. So if you now look under 324A and you ask, what is it that CNA is being held liable for? It is not Grace's liability, certainly. And it's not Grace's liability generating conduct. It is, it is that there is a hazard which arose for, by whatever reason, whether with or without any fault by anybody. And Grace, Grace does not, is not an element of that. It's that, it's the CNA engaged with a hazard that, that was there. It undertook, it made an undertaking to address that hazard and then it failed to do so, thus injuring our clients. So are you asking us when we look at 524, I'm sorry, it's at 324A, are you suggesting that you would prevail under A, B, and C? Or do you agree, at least on A, that there is the building of liability on liability, that, that at least A would be derivative? I'm sorry, by A, you're talking about the awards, his failure to exercise reasonable care increases the risk of such harm? Yes. Well, no, Your Honor, because the important point is that when I say no to is no, that would not, proceeding under A would not render the claim derivative. And the reason for that is that 324A does not have to do with Grace's liability or Grace's conduct in relation to the risk. It is just a risk that could exist because, you know, God created, you know, in that mountain in Libby, it could be an earthquake, it could be some other company, or it could be Grace, but it doesn't, that nowhere appears in 324A as an element of liability. 324A, what you need is A, risk, and then an undertaking, of course, by CNA to control the risk. So, the, the importance of 324A is that it requires active conduct by CNA in order to generate liability. This is not a, this is not the situation of Don and Gas, which I'll address in a moment, but this is a situation, this is a situation where the only way that you establish the undertaking that's required by 324A is by, is by affirmative conduct that, that indicates that you have, that you have commenced an undertaking. And as it happens, the Montana Supreme Court did say that the normal activities of an insurer are not sufficient to constitute an undertaking under 324A. So, the only cause of action that exists in Montana under 324A in this situation is, is the very situation that we have and the one that we allege, which is that there's active conduct and active undertaking by CNA to engage, to provide those industrial hygiene services and protect our clients from, from risk. Why, why isn't that though, you know, opening Pandora's box as, as, you know, Mr. Burgess was cautioning? Because once you say you can make that allegation, that's enough to, you know, proceed in state court. The, you know, the, the exposure in terms of liability around the country just to defend those suits, you know, could be quite significant. Yeah. Yes, Your Honor. And that, that really goes to what is the statutory scheme trying to accomplish? And this court gave the answer to that in, in, in its 2018 decision. It said that it's to protect the insurers from, from derivative liability. Even though non-derivative liability and defending against it and so on might be very expensive and not very pleasant for the insurer and could result in oodles of additional liability to the insurer. That's not the subject of, of, of the bankruptcy statute. And, and for constitutional reasons, it probably couldn't be, but, but, but, but nevermind that the statute is drafted, only ties it very closely to the interest of the bankruptcy estate in settling its insurance policies. So the idea of that injunction is to protect an insurer from any further liability under its insurance policies, once it settles with the bankruptcy estate. So if an insurer has a hundred million dollars of liability under an insurance policy and has another 50 million dollars of liability on top of that for its own non-derivative misconduct, it's still to the advantage of that insurance company to settle with the bankruptcy estate for a hundred million or for some compromise figure or whatever. And that benefits both the bankruptcy estate and the insurer by avoiding any further litigation and liability on that subject. But, and the fact that the bankruptcy estate can't, and the bankruptcy law can't solve the insurer's problem of its own non-derivative liability doesn't, doesn't, doesn't prevent the insurer from being very well motivated to settle with the bankruptcy estate. And indeed, if you look at asbestos cases, in fact, if you look at this asbestos case, you have almost all of the insurers lining up to make those settlements with the bankruptcy estate, so that they can be free of their insurance related liability. And if they've gone and they've done something else, Mr. Burgess mentioned, you can have a bad faith claim arising under the very insurance policies at issue. And he concedes that would be non-derivative. Well, those claims can be fantastically expensive to defend. They're very, they're very difficult for insurers. And, and yet, and yet that's not what the bankruptcy statute is trying to protect insurers from. It's trying to protect insurers from liability under insurance policies. And it does that not because the bankruptcy code likes insurers or wants to provide them with any special advantage in life. The bankruptcy code does that because the bankruptcy policies are an bankruptcy estate, which the value of which needs to be maximized by the ability to issue this kind of protective injunction. What's left then of derivative liability in your view outside of just an action for proceeds under the policy? Well, you know, that's a fair question, Your Honor, because in the real world, situations are not likely to arise where that would invoke that footnote. I'll call it the Dodd-Gass footnote. Okay. So why did the 2018 panel include that? Well, you know, kudos to Judge Ambrose. He was thinking not just about, about provision of insurance, but you know, there are three other statutory relationships that the derivative liability standard applies to. In other words, it has to be, you have to have both derivative liability and it has to arise by reason of one of the four statutory relationships. And those other are things like ownership of an interest in the debtor, engaging in a corporate restructuring with the debtor, involvement with management of the debtor, things like that. And you can easily see how Dodd-Gass and the other cases cited in that footnote, having to do with responding at Superior and piercing the corporate veil and all those other things could be tremendously relevant to a determination of what's derivative in that context. Now Congress drafted the statute, so the same language, the same derivative standard applies for all four statutory relationships. And that does mean that if an insurer, for example, you know, put itself in the position of owning an interest in the debtor or engaging in a corporate restructuring with the debtor in the Dodd-Gass sense, then yeah, it would then meet the derivatives liability standard, which is drafted, as I say, for all four of those statutory relationships. But the fact that it's not very likely in the real world that an insurer would do those kinds of things doesn't mean that the derivative liability standards, it doesn't, I'm not reading that footnote out of the 2018 decision. I'm just explaining why it is that I think Judge Ambrose did a very careful job. But why did he need to be that careful if all he had to say was, no, these aren't direct claims for insurance proceeds, we're done. There's no reason to be that careful. There's no reason to remand if he's thinking at least under the third of the qualifying statutory relationships, that it's really just a set of one. He didn't need to be, I mean, it's really, really nice to think about the other three. It's great. But at one level, there was no need for remand then, and there was no need for anything else, unless he was still contemplating in this context involving an insurer, that there was something more. I mean, I doubt that panel would remand if the answer was for insurers, derivative liability only means direct proceeds. Well, Your Honor, the fact that, I mean, I've said in the real world, it's vanishingly unlikely, vanishingly unlikely that there would be any other kind of derivative liability for an insurer. But again, the statute is structured so that derivative liability definition applies to all four statutory relationships. And this court will be very grateful, I think, to that 2018 panel, if when the next case comes along, and it involves a different relationship, you know, it's restructuring, you know, where derivative liability is an issue, or it's a case of somebody managing the debtor or owning the debtor, this court would be very grateful that Edro reserved those other definitions of derivative, because those may well be very importantly applicable to that kind of situation. No, it's great in that scenario, but I still don't understand why there'd be a remand here. But like, it makes perfect sense to think ahead, to do all that stuff. And so the opinion could be written that exact same way. Getting to the end and say, oh, and we remand to determine on questions of state law, whether it's totally separate, you could just say, and we, you know, reverse, or something else. So what he's contemplating or what that opinion is contemplating is, I agree, helpful. But it also is hard to gel that helpfulness as being the only purpose of those statements, if there was no other situation other than direct proceeds from an insurer. Well, I think that the, when you look at the whole issue of Montana law, and of course, the judge, you know, first of all, whether, as you point out, there was a remand for choice of law issue, which apparently, if that had been in the record, adequately from the court's perspective, it would have, you know, it would have said Montana law applies, so go and determine Montana law, said determine choice of law, determine Montana law. And so apparently, and in this, you know, in this kind of instance, one has to defer to the judgment of that earlier panel, they didn't understand Montana law well enough to understand whether any of this stuff necessarily would apply or would not apply. Well, okay, you know, I mean, look, there is, there's, it's just a recurring problem to match a federal standard with state law. Like it's just, it's just, it's just a recurring problem, because they don't always fit together, as neatly as Congress may like, or state legislatures may like, they just, it's not always perfect. And so here we've got, and I think I read 324A the same way you do in the sense that it's vague as to who caused the harm, it be an act of God, as you say, it could be a debtor, it could be someone else. And so, so, but we then have to match that vaguery of state law, where it doesn't say that vagueness of state law, where it doesn't say who actually caused the harm that someone else has a duty to protect against, with the text of 524G42, which focuses on conduct. And so it strikes me, and tell me why this dividing line doesn't work. If CNA had sent inspectors to do workplace inspections, and they detected seismic activity, and they said, oh, it looks like there's going to be an earthquake, but they don't tell anyone. And then there's an earthquake, right? I think they have potential liability under 324A, but I don't think they have any shot in the world of getting into the channeling injunction. But if they come, and they do the inspection, and they say, oh, you know, there's dust in the air, and it seems that GRACE is causing this, and this is, this is just that part of the GRACE manufacturing process, or how the plant operates, and they don't tell anyone, why isn't the answer to that vagueness? Because the statute says conduct, that that relates to the conduct, such that now they're eligible for the channeling injunction in a way that they wouldn't have been eligible had it been seismic activity. Well, Your Honor, first of all, we, as you've just acknowledged, 324A doesn't make any specific reference to who caused the conduct. Now, that's your point. That's a good point. That's a great point. You made it. But secondly, Your Honor, as I just discussed with Judge Krause, 324A doesn't even require that anybody, the GRACE or anybody else, be at fault for the existence of a hazard. And so if you subtract out those two things, Your Honor, then what you are left with is GRACE's conduct in a situation where we said it could have been adequately controlled, but GRACE generated the asbestos. And this court, in its 2018 opinion, is crystal clear that the fact that it's GRACE's asbestos is not sufficient. And furthermore, you don't look at the facts having to do with the GRACE's asbestos. What you're looking at are the legal elements of liability under state law. That's the entire focus of the decision. And that's why I then come back to 324A as interpreted by the Montana Supreme Court and say that that cause of action under 324A is entirely separate and independent, doesn't require GRACE as an element of liability. And in case we have any doubt about that, the Montana Supreme Court said so. And so it places this case, perhaps almost uniquely, in a situation where you now have a definitive reading of state law. You don't need to. There's no interpretation required. You've got the ruling of the state's highest court about what state law requires, and it doesn't require GRACE. We were also clear the first time around that nothing in the statute's text supports indirect insurer liability only where the claimant seeks to recover insurance proceeds. And we've rejected your attempt there to limit the meaning of the direct or indirect liability to the claim for insurance proceeds. Yes. It seems like you're taking us right back there. Well, no. No, I'm not, because I am acknowledging that if CNA actually satisfied the requirements of a Dodd-Gass kind of claim, if those were the facts, really, if that were the legal basis of our claims, if we were suing under some theory of respondeat superior or some theory that involved CNA controlling the debtor, then absolutely, we would lose, and we're certainly bound by that footnote, and that makes a great deal of difference from a conceptual viewpoint. I guess I'm just saying that those aren't the claims that are asserted here. The claims that we're asserting against CNA have nothing to do with CNA controlling the debtor and being responsible for the debtor's actions. CNA is being held responsible for its own actions. And so the footnote, while conceptually it can apply, just doesn't apply to the causes of action that we're asserting here and the basis of CNA can be liable only if it's an insurance company. I guess I'm leaping ahead to the statutory relationship issue, but even back to derivative liability, if it said that CNA will be liable for claims against grace, even beyond its insurance policy liability, if it goes and conducts inspections, if that were the state law of Montana, then that would be a derivative claim. And so upon remand, Judge Chan properly considered what were the elements of state law, and the liability of grace or CNA being responsible for claims against grace simply isn't part of it. Why don't you turn to the statutory relationship issue? Sure. Shall we tackle that one now? And yes, and legal relevance in that relationship in this context. Sure. So the 2018 decision says that to meet the statutory relationship requirement, the provision of insurance would need to be legally relevant to the Montana claims. And that legal relevance standard, that's a term of art, comes from the Second Circuit's decision in Quigley. That was the case where Pfizer was the debtor's corporate parent, and being the debtor's corporate parent is one of those four statutory relationships. Pfizer let the debtor, its subsidiary, use the Pfizer name on its asbestos products. We might all want to think about that as we go for our COVID vaccinations, but never mind, that was years ago. So asbestos claims were asserted not just against the debtor as the actual manufacturer of the asbestos, but against Pfizer as an apparent manufacturer, because it had let its name be used. The Second Circuit said no injunction under 524 G4, because the corporate parent relationship is not legally relevant to Pfizer's liability. The claim against Pfizer did not require the plaintiffs to prove the corporate relationship. And indeed, if Pfizer had no relationship with the debtor, or for that matter, if Pfizer had been the debtor's insurer or director or investment banker, you know, other statutory relationships, the elements of the cause of action would have been exactly the same. They did not include any of those statutory relationships. So all the parties agreed, and the court acknowledged that as a factual matter, Pfizer would not have let the debtor use its name, but for the fact that it owned the debtor, and was going to gain a financial advantage by having the debtor use the Pfizer brand. Just as it's undisputed here that CNA would not have gotten involved as a factual matter with industrial hygiene at the Grace facility, but for providing insurance to Grace. The court drew a distinction between factual relevance and legal relevance, and determined that legal relevance is the standard, not factual. Don't we, if we think the provision of insurance, you know, as Mr. Bergeson, the various amici have argued, it includes the kinds of risk assessments and recommendations that were made here, then it's more than just the fact of a relationship, that it is by virtue of those very insurance services, if you construe them that broadly, right? Well, you know, recognize that the Second Circuit in Quigley faced really the same kind of situation. You had, I mean, being a corporate parent is a legal relationship. That legal relationship was the cause of Pfizer letting Quigley use its corporate name. Just as here, the insurance policy, that's a legal document. Being an insurer is a legal relationship. Those relationships have legal consequences, and they are the factual reason why CNA went out and provided the services that it did. But the insurance relationship, the insurance policy, none of those, neither of those, I should say, are legal elements of CNA's liability. So that's why, you know, in Pfizer, of course, the court could have ruled that the fact that most, you know, corporations let their subsidiaries use their brand name, that's actually a common branding strategy out there in the court. The court could have said, well, because it's a common strategy out there, it's common conduct arising out of the parent-subsidiary relationship, that therefore it's within the scope of the injunction. But isn't the claim here by Continental that it's actually inherent in its insurance services? That seems like what we were referring to in footnote eight of the greatest opinion, suggesting that there is necessarily legal relevance if you've got, you know, a duty that is deriving from the provision of insurance that, by its very nature, includes routine inspection practices. So is part of this, you know, dependent on a claim alleging something different than routine inspection services? That's it precisely, Your Honor. Thank you. That is exactly the distinction. It's that, and the Montana Supreme Court made it very easy because they said, if an insurer just does what insurers do, there's no claim. So our claim necessarily under Montana law must include, and it does include, the allegation that what they did was of a completely different degree, depth, and character from what an insurer would normally do. And under those circumstances, the only relationship between provision of insurance and what CNA did here is the factual, that factual relationship that the whole reason that they got involved with Grace's facility to begin with was because of the under Quigley and under this court's 2018 decision. How do we make, is that a determination we can just, you know, make as a matter of law, just drawing a line? Because, you know, Mr. McGuess and Anneke there are saying that what is alleged here as actionable conduct is incidental to the provision of insurance. And that's the way the industry works. And your ability to proceed, you're suggesting, may hinge on it being something far more than incidental. How do we make that determination with what we have before us? Well, the answer, I mean, hypothetically in some future case, this could conceivably be a difficult line drawing exercise. But as I said, the Montana Supreme Court has made it easy because what they will do is they'll knock out our claim. If they conclude that all that we're alleging is the kinds of things that insurers customarily do, they've already said that does not rise to a claim under Montana law. They did in the case of MCC, and we make similar allegations about CNA, they've said, yeah, if you do that kind of stuff, then you're, you know, that's not insurance. That's industrial hygiene. That's a separate undertaking under 324A, and you're liable. So in this case, you can simply affirm and let those cases go forward, knowing that, you know, knowing that under Montana law, there is no danger of this slipping over into that, you know, into that delicate area. If it comes down to a future case, your honor, what this court would need to do is to look at the elements of whatever the state law that was at issue. And if that state, you know, had a law that said workers' compensation insurers who go on the site and make, you know, safety recommendations or whatever can be liable if those recommendations injure a third party, I think you would look at that law and you'd say, well, that provision of insurance is a legal element of the law as I just described it. But you just have to take it on a case-by-case basis, depending on what the elements of state law are. It's a very important aspect of this decision, of the 2018 decision, is that it respects federalism. It says the starting point is what is it that the state says you can be liable for? And only if what a state says you can be liable for includes provision of insurance as an element, does this court need to get involved in order to protect the federal interest? So the legal relevance standard, as I said, is a matter of... what I say, namely that the provision of insurance would have to be an element of the claim. I realize that legal relevance, and Mr. Burgess has argued this in his brief, that legal relevance is a different term from legal elements. So it does raise the question, is there some daylight, if you will, between legal relevance and legal elements? And the answer to that, Your Honor, is that in the Pfizer... I'm sorry, in the Quigley decision itself, what legal relevance meant was that the statutory relationship was not a legal element. And this court did not, in its 2018 decision, suggest it was doing anything other than importing legal relevance from Quigley. Now, I think that what the Second Circuit was doing when it used the term legal relevance, rather than just saying legal elements, was it was keeping an eye open for the fact that in some future case, it's possible that the provision of insurance might not be an element of the claim, but could be, for example, an element of the defense to a claim. Consider, for example, if there were a state law that imposed certain presumptions on an insurer. And let's say those presumptions were relied upon by the plaintiffs. Maybe that would be an instance where legal relevance, where it would be legally relevant, because it was relevant to a defense, not to the proof of the claim, but not an element of the claim itself. Or suppose that a state said, there's a three-year statute of limitations for this cause of action applicable to an insurer, but only two years for everybody else. A claim that was brought between year two and year three, there would at least be an issue of whether maybe provision of insurance was legally relevant in that situation, again, even though it wasn't an element of the claim. So it's very easy to explain why one would use a term like legally relevant, rather than just saying it has to be an element of the claim. But none of that is the outcome here. I'm sorry, go ahead. Should we be concerned if we were to affirm the consequences for the funding of future trusts? Not at all. While there was provision here for indemnity with this in mind, given the that insurers could be hauled into state court based on allegations of undertakings in excess of what would be incidental to insurance, what consequences is that going to have for future justice plans? Yeah. No, that's a very important question. I do want to point out that as to the CNA settlement, most of it was in hard money dollars, which could not be returned to CNA under any circumstances, and presumably that was the liability that CNA had under its insurance policies. So then they added on this indemnity, and a possible interpretation of that is that you're never going to see it again, because the whole purpose of the indemnity was to create jurisdictional issues that would be of concern to this court, because they knew that this matter was going to be litigated. And that once it is clear that claims under 324A can simply proceed in state court, insurers aren't going to bother with this. And what will happen is that future settlements will just do, here's $70 paid in this case, here's $70 million to settle our insurance liability, and we're not purporting to settle anything else, because everybody acknowledges that nothing else can be settled. And the financial result to bankruptcy estates will be exactly the same, and it will be exactly what it should be, which is that the bankruptcy estate can settle what it owns, which is the causes of action for the insurers, in this case, could even be intentional misconduct, can't just take those away from this small group of claimants who were the victims of that, and just throw it into the bankruptcy estate, because it doesn't belong to the bankruptcy estate. So this will have, in terms of economic impact, it will have no economic impact on future cases, and it hasn't had any economic impact on past cases. Insurers have written very big checks to bankruptcy estates to settle their insurance policy-related asbestos liability, because they had very good economic reasons to do so. I mean, in terms of dollars and cents, is there a big difference that these are tort law theories to make people whole? Is there a difference in the bottom line recovery that a plaintiff can get directly against an asbestos manufacturer, and then vicariously or through direct action against the insurer, versus against the insurer on a failure to warn or 324A theory? It seems to me that the exposure, if the goal, the metric of damages, is to make someone whole, both of those theories lead to the making of whole, and if they do, and now the answer is, well, insurers like CNA buy themselves out of one of those glasses of soup, but they don't buy themselves out of the other. When the exposure is at least order of the magnitude similar, why wouldn't that have an effect? Well, because, Your Honor, there are two separate, think of this as being two separate pools of dollars, okay? Insurance policies are all written with limits, so CNA's limits here, I'm just going to make up the number, I'm sorry, I don't remember what it is, and of course CNA was not, they weren't a primary insurer, they had some, you know, they had some reinsurance limits and so on, so I'm just going to make up a number, okay? So let's say CNA's liability under its insurance policies was potentially $100 million, but it has defenses of, you know, that it thinks would get it out of a big portion of that, and so they end up settling for 70, all right? And then there's another pool of dollars, which is CNA's own net worth. It's the corporate dollars that it just has, not to pay under insurance policies, but to pay for its own misconduct, and for all we know, you know, maybe CNA has its own insurance, you know, to insure against that conduct, but the point is that those are two separate pools of money, and the fact that you, the fact that we, to achieve recovery for the Montana plaintiffs, the fact that we get it from, you know, CNA's pocketbook as opposed to their insurance liability costs nothing to the bankruptcy estate. The bankruptcy estate still gets the 70 million dollars or whatever the figure would be in any particular instance representing a fair settlement of CNA's insurance liability. But I guess my thought is, why would they make that same settlement if their total exposure under 324A mirrors their exposure as insurance? And again, there are limits to insurance coverage, but if it's close or greater, then why are you buying yourself out of the similar or lesser? What incentive do you have to buy yourself out of the similar or lesser, assuming that there's also bars on double recovery, right? It seems like, now there's just two ways to get this, so why, like, it strikes me as, yes, there may be an incentive to buy yourself out of one, but that's not a big incentive as I see it. You want to buy yourself out of all. Well, so if you can get the same amount, I mean, if you aren't buying yourself out of all exposure or all liability, that, it just, in my head, it's a matter of intuition, suggests that you won't pay as much if you aren't getting a stronger release. Well, first of all, Your Honor, it is probably true that, I mean, let's say that CNA, you know, again, using, let's say it's got $100 million of insurance liability, $50 million of liability to our, you know, to the Montana plaintiffs. It might be true that they write a check for $150 million in the bankruptcy estate if they could get, if the bankruptcy estate could basically steal our claims and then give a release of them. And in fact, if the bankruptcy court could say, and not only are we releasing you from claims having to do with Gray's asbestos, why don't we release you with claims for everybody else's asbestos? Maybe they pay a billion dollars, but that doesn't mean, you know, that doesn't mean that that's either what the statutory scheme envisions or what would be, you know, what would be fair and fair. So I would ask, Mr. Cohen, is, is the difference that via a bankruptcy, you're pretty much trying to settle the case in this bankruptcy judge versus the state court system? In the state court system, what you're talking about is jury trials. And I would think in your circumstance, economically speaking, you stand a better chance before a jury in terms of client than you would in the bankruptcy court. Is that one reason why you're advocating so much for having these matters resolved in the state court system? No, no, no, Your Honor. It's really not that at all. The problem is that, that the debtor is insolvent. Say again, please? The debtor is insolvent. Well, I'm sorry, the debtor was insolvent at the time. It was, but it has a pool of money. If I am not mistaken, it's quite significant. It's in 75 million or something like that. Well, the debtor, yeah. Well, and there's insurance costs. I mean, there are, there are several billion dollars of claims. Yeah. You see, CNN is covering some, et cetera. But go ahead. What, what is the major difference? I mean, from an economical standpoint. The major difference is that we get only fractional dollars from the bankruptcy estate because the bankruptcy estate is not paying things. It's paying them at cents on the dollar. And then, and there are also, there are also various kind of provisions of the asbestos trust instrument, which also effectively limit recoveries so that the claim there would not be as great as the claim that we would have in state court. It doesn't so much matter. It's not so much jury versus non-jury. And it's just the fact that, that the terms of the trust are so arranged that they won't pay for our full damages. All right. So economically speaking, you would be much better in the state court system. We would be much better in the state court. Yes. And so that, so that encourages pioneering of state law causes of action that would get you out of the channeling injunction. Your honor, absolutely. Lawyers, you know, lawyers are, will always try to do the best for their clients. But a hundred cent dollars versus five cent dollars, that's a big difference. If you go back to them, even to the second circuit decision in Manville, okay, this goes to my federalism point again. The court in Manville observed that there are all sorts of claims that lawyers are asserting out there in state court against Manville's insurers. And those claims, they're going to be permitted to assert those claims in state court. And it observed, by the way, that no state had, the more exotic claims, no state had ever held that those were basis for liability. But nevertheless, as a matter of, as a matter of federalism really, it's the states that determine what people are liable for. And if a state determines that under, that under, you know, these five elements, an insurer can be liable, there's no interest in the bankruptcy system in preventing that from happening. So the only interest in the bankruptcy system is to make sure that when a check gets written to settle the insurance policy, that check goes to the debtor's estate and is used to pay claims. Your, so what you're seeking is that we sort of free you from the channeling injunction requirement. I would like to throw that at somebody, but I can't. So what you're, you're seeking essentially is to get out of the channeling injunction requirement for some relief and to go into the state court system. Yes, Your Honor. We are saying that our claims entitle us to, are the nature of that. They're not within the scope of that channeling injunction. What is, could you clarify that a little bit? What, you say you're entitled to it, as opposed to being directed to present your claims via bankruptcy. You're entitled to go to the state court system. Well, Your Honor, well, first of all, we were entitled to assert claims against the, against the asbestos trust. So we have that entitlement anyway. So the question is, you know, just as, by the way, it's typical in a bankruptcy case that if somebody has a claim based on grazes asbestos, they may, our clients don't, but other people may have claims against Manville's bankruptcy estate for Manville's asbestos. And so everybody has multiple sort of paths of recovery, if you will. And so the only issue here is whether our alternative pathway to that the reason that it does not get enjoyed by the channeling injunction is that it doesn't meet, that our claims don't meet either that's derivative law requirement that we've been talking about or the statutory relationship requirement. Unless our claims meet both of those requirements, which are tightly drawn under section 524 G4 and interpreted by this court in the 2018 decision, that a channeling injunction may not under the statute are our claims. So that's what we're saying. Great. We've gone far over time for both counsel, but Mr. Pergas, you can certainly have your time for rebuttal and please wait. Do concerns of federalism mandate affirmance here? Sure, Your Honor. I think they do not. I'm happy to get to that. There are three points I'd like to three issues I'd like to address on rebuttal dealing with derivative liability, dealing with statutory relationship, and then the last on the incentive. I think the fundamental problem with my friend, Mr. Cohen's argument is that it just makes no sense of the 2018 decision, or at least makes it a very strange exercise. His submission and he reiterated is that effectively the only kinds of claims that you're going to be able to seek against an insurer by reason of its provision of insurance will be the claims, the direct actions for insurance proceeds. His response to that is that, well, you could imagine other kinds of claims based on its bail piercing theory, but having two responses to that, one, that would no longer be arising by reason of the provision of insurance. It's non-responsive to say, well, if you had a different theory of liability, maybe you could go against an insurer. That was not the theory that was at issue in the 2018 appeal. It's not just that there's a vanishingly small possibility that in the real world, you could come up with other things. None of the vanishingly small possibilities were alleged. It was not presented by the Montana plaintiffs in the first case. It's not the predicate for their theory. The notion is that if you're seeking a claim against an insurer, and the question is, can they be enjoined by reason of their provision of insurance? Their answer is a categorical no. If you're seeking anything beyond the insurance proceeds, it is not something that can be channeled under the injunction. This court rejected that, rejected it squarely. Mr. Cohn, in addressing, and I think the key language of why the court addressed it is what Judge Phipps was discussing earlier, that it refers more broadly than being held liable for the liability of the debtor, but reaches to the conduct of the debtor. I understand Mr. Cohn's argue that, well, it must be liability conferring conduct, but I just don't see where that restriction comes into the statute. I think it's very reminiscent of their argument the first time where the court said, look, this is broad language that is referring generally to being held, not just directly liable, but indirectly liable for the claims against conduct of or demands of the debtor. We see no basis in that statute to restrict it to just the claims for insurance proceeds, just the direct action for proceeds. Why does it make sense when we look at the language and apply traditional canons of statutory interpretation, the other terms, demands and claims, you do relate to liability. Why shouldn't the conduct that gives rise to liability be the meaning that we ascribe to that term? Especially if you think of a 524G trust as dealing with the liability of the debtor. We're allowing for this liability of third parties in some cases to be brought in, but it's got to be predicated on the liability of the debtor. Don't we have to read that into the term conduct? I don't think so. This is a list of three terms. It's not as though you have a list of seven and you would say, well, let's find six have this common denominator and the seventh one doesn't, so we're going to read it more broadly. I think they are independent terms and conduct has its encompass situations in which the debtor itself wouldn't necessarily be liable. Certainly, that includes the immunity situation, but I don't see any basis in the statutory text to restrict it that way. Again, I don't think this is a matter of first impression for the court because it is that specific statutory language on which the court relied in the 2018 decision to say, no, we are not going to say that these claims are limited to direct action seeking insurance proceeds. We don't think the direct liability and the being held directly liable does that. Beyond that, it has an indirect being held indirectly liable for the conduct of the claims against the debtor. At the very least, that doesn't have the restriction and that's what the court held, but I don't think that that is open for the court to revisit. So can I just follow up? I mean, I'm trying to get as tight as I can with the choices, right? Like surely we have to make a choice. And so as I understand it, on the one hand, we can read this kind of how much the interplay between conduct and liability. And on the one hand, I see the choice being conduct that has to be proven for liability. I don't think that's your position. I think that's your friend's position. But then I think that your position is, no, it doesn't have to be conduct that has to be proven for liability. It just has to be conduct that caused the harm that results in the liability. Have I captured your position correctly? I think that it causes the harm, but I also think that it's significant that it is part of the basis for our alleged legal duty here. And I think one way to maybe capture the distinction between our position and my friend's position is they say, because you can imagine instances of 324A liability that would not involve wrongdoing by grace, it necessarily follows that the claim can't be driven. You could have the earthquake example or it being blown on. Our you have to accept the actual claims being presented. And when you look to the complaint, for example, it refers repeatedly to braces, wrongdoing, and it's unreasonable conduct and it's violation of state law, which it notes is responsible for the injuries. It does that in various claims that are asserted against the state of Montana. And then there's a claim against the insurers that essentially holds us, seeks to hold us responsible for not preventing that in the undertaking. And it's not just the allegations. It is true as a matter of historical fact that grace was the source of this. Grace was subject to criminal prosecution with respect to this. The state court, Montana Supreme Court says there's no disputed fact that the direct cause of these injuries was grace. So I think that the nub of the dispute is that we think that matters, that the fact that in these circumstances being alleged in the case that the plaintiffs are trying to present braces conduct totally baked into it. And it's going to be part of why we're, they are seeking to hold us liable under state law. The fact that you could imagine alternative worlds in which we might be liable under the same legal theory where grace was not implicated, we don't think should be what determines whether something's derivative. And we think the best indication of that is because the court identified instances of derivative with gas, with dods that did not, do not have that feature that are instances in which you could, you could have the secondary party have engaged, you know, be liable or have engaged in wrongdoing, but it's not an element of those torts for that to be so. So I think that is the key distinction between our position and my friend's position. They think it is purely legal in that you only look to the elements of the state claim. We think you have to look to the elements of the state but you, you map that on onto that. What actually is the nature of their actions? Are they seeking to hold you indirectly liable for conduct of the debtor? Because what gives rise to your potential claim under the state law is the debtors risk creating conduct. Turning to, I think it turned to statutory relationship. I'll give you a couple more minutes. Yeah, I know. I understand. It's been a long day for all of us. I think, you know, there again, I think the Montana plaintiffs are just not reconciling themselves with the prior decision. In footnote eight, for example, the court indicated that we were described, what we had argued, what we were describing was a legal consequence connection. That would be, if we had proved, you know, if we established that in fact, it is relevant to the legal duty under state law, then what we were describing is a legal consequence. I assure you, we were not arguing for a legal elements test and saying that, you know, providing insurance had to be an element of the claim. We were arguing exactly what we're arguing here, that these services are things that are part and parcel of the provision of insurance. And what distinguishes that from a case like Quigley, where it really is just an incidental fact, it is the, the corporate parent that was not alleged to be the basis for why a duty was acquired that I, it was actually specifically disavowed that there was any legal connection in that case. Here, the predicate for our duty is our undertaking of insurance services. And Mr. Cohn suggests that, well, we are going beyond what are real insurance services. I don't think that is fair or accurate. I don't think as your honor, Judge Krauss indicated, it creates a very difficult line drawing problem. And at a minimum, what we have here are services that you can look at what's alleged, paragraphs 161 and 164, the complainer is essentially the entire allegations about what we did. Those are things that as we've explained, as our amici have explained, are quintessential insurance services. They, as the court recognized in the 2018 opinion, they're services that were, we were allowed to engage in by virtue of our insurance contracts. And the court specifically noted that the reason why claims based on these policies fall within potentially fall within the scope of the injunction in the first place is because they are predicated on the right we have under the contract to engage in inspections and make loss control reports. I also don't think it's accurate that the Montana Supreme Court decision said that what was at issue there were non-insurance services. What it did say is that an insurer routinely engaged in doing the normal kinds of insurance services is not going to only be liable under 324A. I don't think it follows from that, that it was indicating that, well, what is here are non-insurance services. No, it falls within the scope of what counts as insurance. But the key difference for why there was a potential duty there is that grace had seeded the ground in dealing with medical monitoring, something that hasn't been alleged with respect to us. But more fundamentally, I just don't think it is right to say whether there is a viable state law claim that should be the test of whether it's something that can be channeled under 524G. I actually understand Mr. Cohn to agree with that, at least on the flip side, that there could be claims that are non-meritorious that have no basis in existing state law as the Second Circuit suggested in Manville. But that's not going to be a reason we're going to enjoin it. We're not going to be doing that. We're not going to be making that claim to determine whether 524G is a possibility. But the same thing is true here. The possibility that there might be a viable state law claim doesn't mean that the channeling injunction shouldn't apply. And as your Honor's federalism question, I think it would be a real federalism problem for this court to make its 524G inquiry, its determination of federal law, turn on its evaluation. Sometimes you might have it from the state court, sometimes you might not, about whether this is a claim that could proceed in state court. That's just not the nature of the inquiry. But I mean, on the flip side, there's a big, big, big federalism concern if the channeling injunction basically prevents plaintiffs from bringing their cases against CNA in state court based on an independent duty that CNA has and is alleged to breach. You can basically say, hey, wait, 524G would be a complete and total game changer then because it would basically take entire classes of claims and plaintiff's lawyers, as your friend admits, might want to be creative as to what that class constitutes. But we just say, be as creative as you want. No recourse in state court anymore. We hope there's enough in that trust fund that you get more than $0.07. And so, I mean, what that would mean is that 524G would have a huge, huge, huge impact in terms of state law causes of action or potential impact. And maybe that's its design. Maybe that's its purpose. Maybe that's why Congress did it after Johns Manziel. But I don't think that that impact should be minimized. Have I misassessed that impact? I agree there's an impact, but bankruptcy channeling injunctions have that nature, that they are going to block some claims that could nature of asbestos liability. And this maybe takes us to the issue of incentives. It is very important, and Congress wanted to, and the Johns Manziel bankruptcy giant originally wanted to, drafting a very broad channeling injunction that Congress subsequently codified to bring all these claims into bankruptcy. This, I think, goes to your questions, Judge Fuentes. The idea is that you want these claims as things that are related to liability based on the debtor, based on its conduct, brought into bankruptcy, so all claimants have an equal shot. The point is that asbestos liability is unique in that because the harms are often latent and people don't discover them until later, you're going to run out of money. The debtor runs out of money and people that come along with claims later are out of luck. And the way, the major innovation with Johns Manziel and 524G to counteract that is to create these trusts. But as the trustee explained in his amicus brief, these trusts are just not going to work unless you have a significant incentive for insurers to participate. And Mr. Cohn argued that, well, insurers are still going to settle up to their policy proceeds liability, and here what was thrown in was something on top of that. There's no support in the record for the idea that the indemnity obligation, the amount of indemnity that CNA obtained as part of the settlement was related to the number it thought it was potentially liable for the policy proceeds. That's not supported. What CNA did, and this is established in the Caswell Declaration, it really wanted closure. It wanted to be able to end these cases. And that was what, because it realized, what are you buying? Instead of trying to fight out these insurance cases, and we had significant defendants to them, and as Mr. Cohn alluded to, a lot of them were excess policies, so it was going to be years before they would potentially be reached. If we're not going to get much relief, if we're not going to get meaningful closure, why not continue to fight that out and see what we can do to minimize our exposure in that sense? But we wanted to bring this to close, but because we knew that the Libby claims were out there and we recognized that they were going to bring them, and we thought we had strong arguments that they should be subject to the channeling injunction, we recognized that it was going to be a question of first impression. One quick question is, if Mr. Cohn wants to take this case to the state court, as he suggested he would like, does he have the right to do that, or is he prevented from doing that based on the channeling injunction? The channeling injunction operates to prevent bringing those state tort claims. Of course, to the extent they're representing workers and might have workers' compensation claims, we've made clear, and this was established in the first case, those were not going to be subject to the channeling injunction. Those potential things could be brought. Mr. Cohn is just expressing a preference, I suppose. He's expressing a preference, and it's an understandable preference because he's correct that the potential recovery in bankruptcy will be lower, but that's by design because the way this system is intended to operate is to create a pot of money and treat everyone equally. You submit a claim and everyone has to take a haircut, but everyone gets compensated, as opposed to a system where people are trying to jump in line and tort, and first in is going to be the first out. Mr. Verghese, looking at the complaint, at those paragraphs, they don't read as premised on wrongdoing by grace. They seem to be DNA being negligent in the undertaking to provide services. This is a duty of care to living workers and families and that they don't sound like the provision of insurance, testing and monitoring effectiveness of dust control, obtaining medical information on incidents of insurance and deaths. Is this in the complaint where we should be looking to conclude that it really is premised on wrongdoing of grace? Two responses to that. First, when I was referencing those paragraphs, those are about what the nature of CNA's undertaking is and the extent to which those claims are going beyond the provision of insurance. We think they certainly are not, and they fall within the heartland of what insurers routinely do and what was authorized by our contract. They all refer to our alleged failure to make certain recommendations or to take it on in terms of creating a new risk. That's why I was referring to those paragraphs. Elsewhere in the complaint, and there's several, but I think one that's particularly compelling in this regard, on page 134 of the appendix, which is paragraphs 101 and 102, it refers specifically to the unlawful conduct of grace and, quote, the conduct of grace bringing about plaintiff's asbestos disease. That was in a cause of action against the state of Montana, but all those allegations were incorporated by reference in the claims against CNA as well. If the court has no further questions, we appreciate your indulgence. Well, it's been a long day for you as well, and that we have gone this long is really a tribute to the excellence of your advocacy on both sides. You've been very helpful to the court, and it's a pleasure to have this quality of advocacy before us. Thank you, and we will take the case under advisement.